McDONALD, Respondent, v. AMERICAN NATIONAL
BANK, Appellant.

COONEY, Respondent, v. AMERICAN NATIONAL
BANK, Appellant.

(No. 1,324.)

(Submitted April 17, 1901.   Decided July 15, 1901.)

*Banks and Banking—Special Deposit—Defendant's Liability
—Promise for Benefit of Third Person—Enforcement—
Voluntary Trust—Executory Contract.*

1. Plaintiffs agreed to sell a mine to M., and the deeds were placed in
   *escrow* in the defendant bank until payment of $47,000 as a balance of
   the purchase price.   M. sold the mine, to Scottish purchasers, and the
   seventh paragraph of the contract provided that   £20,000   should   be
   deposited with the defendant bank to pay plaintiffs the balance of the
   purchase price in full, and other charges against the mine, and that
   amount and a copy of the contract were forwarded to the bank, and the
   cashier's attention was called to the seventh paragraph.   Plaintiffs, with-
   out knowledge of such contract, agreed to deliver the deeds on receipt of
   $22,000 in cash out of the first payment by the foreign purchasers, and
   to accept M.'s notes for the balance until the second payment.   Defendant,
   without informing plaintiffs of the provisions of the contract between M.
   and the foreign purchasers, paid plaintiffs $22,000.   The foreign purchasers
   never made any further payments.   *Held,* that plaintiffs were not entitled
   to recover the balance of the purchase price from defendant as money
   had and received.
2. Defendant's acceptance of the funds did not constitute an implied promise
   to the foreign purchasers for the benefit of plaintiffs that the defendant
   would pay the plaintiffs the balance of the purchase price in full.
3. The deposit did not create a voluntary trust in favor of the plaintiffs as
   beneficiaries, under Civil Code, Sec. 2951, defining a voluntary trust as
   an obligation arising out of a personal confidence reposed in and volun-
   tarily accepted by one for the benefit of another, and section 2956, declar-
   ing that a voluntary trust is created as to the trustor and beneficiary by
   any words or acts of the trustor intending with reasonable certainty and
   intention on the part of the trustor to create a trust.
4. Under Civil Code, Sec. 2103, providing that a contract made expressly for
   the benefit of a third person may be enforced by him at any time before
   the parties thereto rescinded, plaintiffs were not entitled to enforce the
   contract for the payment of the balance of the purchase price as a con-
   tract made for their benefit, since section 2103 does not apply to execu-
   tory contracts without consideration.

   *Appeal from District Court, Lewis and Clarke County; M.
H. Parker, Judge.*

Actions by Angus McDonald and by Tom D. Cooney against the American National Bank. From judgments in favor of plaintiffs, defendant appeals. Reversed.

*Messrs. Carpenter & Carpenter* and *Mr. H. G. McIntire,* for Appellant.

The draft for $96,800 was not forwarded to the bank as trustee for plaintiffs, or either of them, nor for the benefit of them, or either of them. McDonald consented to receive $15,-000 of that money and Miller's note for $15,000 as payment. Cooney consented to receive $7,000 of that money and Miller's note for $10,000 as payment. The beneficiaries could consent to the new arrangement. (*Bank* v. *Lobdell,* 78 Ill. App. 602.) All of the money received by the bank was paid out with the approval of plaintiffs. If plaintiffs have suffered damage, they may not recover in an action for money had and received. "In order to maintain the action, there must be money in the defendant's hands to which the plaintiff is immediately entitled." The money must actually have been received by the defendant. (4 Wait, Act. & Def. 470; *Beardsley* v. *Root,* 11 Johns. 466, 6 Am. Dec. 386; *Clark* v. *Sherman,* 5 Wash. 631, 32 Pac. 771; *Distler* v. *Dabney,* 3 Wash. 200, 28 Pac. 335; *Thill* v. *Hoyt,* (Sup.) 56 N. Y. Supp. 78; 2 Enc. Pl. & Prac. p. 1021; *Southwick* v. *Bank,* 84 N. Y. 420.) If plaintiffs surrendered any rights through misrepresentation, their remedy is through an action for damages for the deceit. The orders and consents by plaintiffs were admissible in evidence for the defense. (*Edson* v. *Weston,* 7 Cow. 281; *Wilt* v. *Ogden,* 13 Johns. 56; 18 Am. & Eng. Enc. Law, p. 540, note 9; Abb. Tr. Ev. p. 281; Civil Code, Sec. 4606.) Plaintiffs may not possibly recover against defendant without first surrendering or canceling the notes. (6 Wait, Act. & Def. p. 563; *Holmes* v. *De Camp,* 1 Johns. 34, 3 Am. Dec. 293; *Gifford* v. *Carvil,* 29 Cal. 595; *Maloy* v. *Berkin,* 11 Mont. 144-146, 27 Pac. 442.) An indefinite agreement as to amounts will not support *assumpsit.* (*Harvey* v. *Condensed Milk Co.,* 92 Me. 115, 42 Atl. 342.) The amount

that was owing and to be paid to plaintiffs from the $96,800 was designated by Miller and plaintiffs. The defendant could not establish that amount, but whatever was agreed upon between plaintiffs and Miller would have to be satisfactory to and binding upon defendant. If plaintiffs chose to enter into a new contract with Miller for a smaller purchase price, that price would be controlling upon the bank; and, if the bank paid plaintiffs a larger amount than thus agreed upon, it would be liable to Miller for the excess.

Again, under the pleading in this case, in order to recover, it was necessary for the plaintiffs to show: (1) A receiving by the defendant bank of money to the use of plaintiffs, respectively; (2) a demand by the plaintiffs, respectively, for the same, and a refusal or neglect on the part of the bank to comply with such demand. Proof of demand is essential in this class of actions. (Civil Code, Sec. 2451.) There was no demand.

From the seventh clause of the agreement it appears: (1) That there had been an agreement for at least one cash payment of £5,000 before the cash payment of £5,000 mentioned in said seventh clause was to be made. (2) That the cash payment of £5,000 and the loan of £15,000 were not to be made to Miller by handing the money directly to him, but part or the whole thereof was to be applied through the American National Bank in such a way as to aid Miller in acquiring and transferring, and the company in obtaining, a good title to the property, and be equivalent to payment to him, and only the surplus was to be paid to Miller. (3) That evidently Nimmo and Mitchell supposed some attachments, liens, incumbrances, claims and demands existed against the property which Miller had contracted to purchase, and also that at least part of the purchase price had not been paid by Miller. (4) That the plain intention of the parties, as derived from the language of the seventh clause, was that the company should acquire a good title to the property to be conveyed to it by Miller, and that Miller should furnish a good title by the discharge of all liens and incumbrances that might injuriously affect the property, whether they

were attachment liens, mechanics' liens or vendors' liens, or all combined. (5) That it evidently occurred to Nimmo and Mitchell that, if the £20,000 were handed directly to Miller, he might not arrange matters so as to convey a satisfactory title to the company, and the acquisition of the mines by the company might fail. (6) That the money, therefore, with consent of Miller, was to be sent to the American National Bank, to secure the discharge of such liens, and make such payments of purchase money as would enable Miller to convey a satisfactory title to the company; the number and amount of the claims against the property being unknown to Nimmo and Mitchell. (7) That the purpose of paying through the bank any money due as purchase price was not to benefit McDonald and Cooney, but to protect the company, and, if McDonald and Cooney were thereby benefited, the benefit to them was only incidental. Nimmo and Mitchell owed neither a debt nor a duty to McDonald or Cooney, and there is not the slightest indication of an intention to create a trust or make a contract for the benefit of McDonald or Cooney. (8) That the bank was in no respect a trustee for McDonald or Cooney. If a trustee at all, it was for Nimmo and Mitchell or the company; Miller consenting to the arrangement, so that the proposed transfer of the mines to the company could be carried into effect. (9) That the bank was simply an agent for the company to watch the transfer of title. Its duty was that of an ordinary agent of the company, to do what the company itself might have done with Miller's consent to secure a good title.

The company had no concern for Miller's debts, or his creditors. It owed no duty or obligation to plaintiffs, and sought only its own protection. To Miller it was a matter of indifference whether the money paid certain claims or went to him. Only Miller, or the company, or Nimmo and Mitchell could complain of any breach of contract by the bank. Under the Codes of Montana, and the authorities to which we shall call the attention of the court, that agreement was not entered into for the benefit of plaintiffs, and was clearly not admissible in

evidence. In the court below counsel for plaintiffs contended that the contract made the defendant the trustee of an express trust for the benefit of plaintiffs, and that the contract could be enforced by plaintiffs, because it was made expressly for their benefit; and cited the following sections of the Civil Code to support their contention: Sections 2951, 2953, 2956, 3001, 2103. It will plainly appear that those sections do not tend in any way to support the contentions of the respondent. Section 3000 of the Civil Code is as follows: "Sec. 3000. The provisions of this chapter apply only to express trusts, created for the benefit of another than the trustor, and in which the title to the trust property is vested in the trustee; not including, however, those of executors, administrators and guardians, as such." It is doubtful whether the chapter containing that section was intended to apply to any trust property except real estate. The only section of out statutes authorizing the creation of express trusts is Section 1314 of the Civil Code. That section is substantially section 55 of an article of uses and trusts, at page 728, 1 Rev. St. N: Y. That section appeared in Field's proposed New York Civil Code, and came to Montana from California. In New York, except as used in the Code of Civil Procedure, the term "express trust" signified only a trust relating to real estate. (*Considerant* v. *Brisbane,* 22 N. Y. 395; *Brown* v. *Cherry,* 56 Barb. 644.) It seems to have been used with that meaning in Section 3000 of the Civil Code of Montana. The language of the chapter is all applicable to trusts relating to real estate, and but little applicable to the simple disbursement of money by an agent. That the signification of "express trust," as used in the Civil Code, is as above stated, appears from Section 570 of the Code of Civil Procedure. That section, as originally enacted in New York, did not contain the words, "a person with whom or in whose name a contract is made for the benefit of another is a trustee of an express trust within the meaning of this section." (Voorhies' New York Code, Sec. 113.) Those words were added to the section in New York on the ground that "express trusts"

were only trusts relating to real estate; and the section as amended has been adopted in Montana, together with substantially the section which declares what "express trusts" may be created, showing that in Montana "express trusts," as used in the Civil Code, were intended to apply only to real estate. If an express trust, in the broadest common-law sense of the term, was created by Exhibit A, it was not for the benefit of McDonald or Cooney. From the reading of the agreement it has already appeared that the arrangement as to the discharge of liens and unpaid purchase price was simply for the benefit and protection of the company, and provided a scheme for the purpose of such protection. Section 3001 of the Civil Code is simply a partial repetition of said Section 2103, and to give it any application to this case it must be established that an express trust has been created for the benefit of another than the trustor, and that the title to the trust property has been vested in the trustee. This Section 3001 states only one of the elements of a trust for the benefit of another than the trustor, and means that there shall be no such trust without an agreement to that effect between the trustor and trustee. There was no trust created for the benefit of plaintiffs in accordance with the chapter of the Civil Code on trusts. There was no such trust created by Sections 2956 and 2957 of said Code, because, by the agreement itself, as we have already seen, there is shown no intention to create such a trust.

This contract was not an agreement for the benefit of plaintiffs, within the meaning of Section 2103 of the Civil Code. That section has no application to the agreement offered in evidence, as we have seen that the agreement was not made expressly for the benefit of plaintiffs, or with any purpose for their benefit. But, to show the utter irrelevancy of this agreement as testimony to support the causes of action alleged in the complaints, it is proper to call the attention of this court to numerous decisions of other courts upon analogous questions and identical legal principles. The English rule is that, where one of two persons, for a valuable consideration, agrees to pay the

other's debt to a third person, an action by such third person against the promisor will not lie. In several of the United States such an action will lie. The leading American case to that effect, though not the first to break away from the English rule, is that of *Lawrence* v. *Fox,* 20 N. Y. 268. In that case it was held that "an action lies on a promise made by the defendant upon valid consideration to a third party for the benefit of plaintiff, although the plaintiff was not privy to the consideration." This case was decided on the authority of an early English case not followed in England, and of certain Massachusetts cases, since overruled in that state, and, while not overruled in New York, the courts of New York have repeatedly announced that the principle of *Lawrence* v. *Fox* "should be limited to cases having the same essential facts." (*Lorilard* v. *Clyde,* 122 N. Y. 503, 25 N. E. 917, 10 L. R. A. 113; 7 Am. & Eng. Enc. Law (2d Ed.), pp. 105-107.) The New York cases since *Lawrence* v. *Fox, supra,* and *Burr* v. *Beers,* 24 N. Y. 178, 80 Am. Dec. 327, all hold that, to give a right of action to the so-called "beneficiary" against the promisor, there must have been a duty or obligation from the promisee to the so-called "beneficiary" upon which a legal right could be based, and the contract must have been entered into for the express purpose of conferring a benefit upon him, and that it is not sufficient that a benefit might incidentally accrue to him.

Whether the arrangement be called a contract or a trust is immaterial, as every accepted trust is a contract, and a majority of contracts are trusts in the sense that "personal confidence is reposed in, and voluntarily accepted for the benefit of, another." Whenever an action at law can be maintained, it is because there is a legal right in the plaintiff. The enforcement of a pure trust should be made in equity, and not at law. (*Garnsey* v. *Rogers,* 47 N. Y. 233, 7 Am. Rep. 440; *Vrooman* v. *Turner,* 69 N. Y. 283-285, 25 Am. Rep. 195; *King* v. *Whitely,* 10 Paige, 465; *Hoffman* v. *Schwaebe,* 33 Barb. 194; *Townsend* v. *Rackham,* 143 N. Y. 522, 38 N. E. 731; *Durnherr* v. *Rau,* 135 N. Y. 222, 32 N. E. 49; *Merrill* v. *Green,* 55 N.

Y. 270; *Simson* v. *Brown,* 68 N. Y. 355; *Railroad Co.* v. *Curtis,* 80 N. Y. 222; *Lehman* v. *Musgrave* (Sup.), 48 N. Y. Supp. 499.) The New York rule that "incidental benefit is not sufficient to give a right of action, but there must be a direct object to benefit a person in order to entitle him to sue, and a legal duty owing to him by the promisee," has been followed in California in the construction of the statutes under which plaintiffs claim. (*Chung Kee* v. *Davidson,* 73 Cal. 525, 15 Pac. 100; *Buckley* v. *Gray,* 110 Cal. 346, 42 Pac. 900, 31 L. R. A. 862, 52 Am. St. Rep. 88; *Bank* v. *Thornton,* 112 Cal. 259, 44 Pac. 466.) The same rule is recognized and applied in other states. (*Greenwood* v. *Sheldon,* 31 Minn. 254, 17 N. W. 478; *Ferris* v. *Water Co.,* 16 Nev. 44, 40 Am. Rep. 485; *Burton* v. *Larkin,* 36 Kan. 246, 59 Am. St. Rep. 541, 13 Pac. 398; *Lumber Co.* v. *Miller,* 28 Ore. 565, 52 Am. St. Rep. 807, 43 Pac. 659; *Montgomery* v. *Spencer,* 15 Utah 495, 50 Pac. 625; *Wright* v. *Terry,* 23 Fla. 160, 2 South. 6; *Crandall* v. *Payne,* 154 Ill. 627, 39 N. E. 601; *Jefferson* v. *Asch,* 53 Minn. 446, 55 N. W. 604, 25 L. R. A. 257, 39 Am. St. Rep. 618; *Linneman* v. *Moross' Estate,* 98 Mich. 178, 57 N. W. 103, 39 Am. St. Rep. 528; *Howsmon* v. *Water Co.,* 119 Mo. 304, 24 S. W. 784, 23 L. R. A. 146, 41 Am. St. Rep. 654; *Parlin* v. *Brandenburg,* 2 N. D. 473, 52 N. W. 405; *Parker* v. *Jeffery,* 26 Or. 186, 37 Pac. 712; *Washburn* v. *Investment Co.,* 26 Or. 436, 36 Pac. 533, 38 Pac. 620; *Wilbur* v. *Wilbur,* 17 R. I. 295, 21 Atl. 497; *Meech* v. *Ensign,* 49 Conn. 191, 44 Am. Rep. 225; *Harvey* v. *Condensed Milk Co.,* 92 Me. 115, 42 Atl. 342; *Mellen* v. *Whipple,* 1 Gray, 317; *Borden* v. *Boardman,* 157 Mass. 410, 32 N. E. 469; *Aldrich* v. *Carpenter,* 160 Mass. 166, 35 N. E. 456.) In the United States courts the same rule obtains. (*Second Nat. Bank* v. *Grand Lodge of Free & Accepted Ancient Masons,* 98 U. S. 124, 25 L. Ed. 75; *Keller* v. *Ashford,* 133 U. S. 621, 10 Sup. Ct. 494, 33 L. Ed. 667; *Constable* v. *Steamship Co.,* 154 U. S. 73, 14 Sup. Ct. 1062, 38 L. Ed. 903; *Austin* v. *Seligman* (C. C.) 18 Fed. 520; *Anderson* v. *Fitzgerald* (C. C.) 21 Fed. 294; *Woodland* v. *Newhall's Adm'r* (C. C.) 31 Fed.

440; *Sayward* v. *Dexter, Horton & Co.,* 72 Fed. 765, 19 C. C. A. 182.)

*Messrs. Cullen, Day & Cullen,* for Respondents.

The defendant bank, having a duty to perform under the agreement, was advised of it, and had a copy of it, which it still had in its possession on the 28th day of September, when payment of certain moneys was made to the plaintiffs in the action. Though having the deeds of the interests of Messrs. McDonald and Cooney in escrow, to be delivered on payment of the amounts due them, respectively, and having likewise in its possession the agreement by which money was to be expressly provided for the payment of these sums to plaintiff, it did not notify them of the existence of the agreement, or of the provisions it contained for their benefit, and suffered them to enter into a transaction with Miller; they being misled at the time into the supposition that Miller was still to receive another $100,000 as an additional payment on account of this sale. Messrs. Nimmo and Mitchell, in pursuance of their agreement, organized a company called the "Diamond Hill Gold Mines Company, Limited," and on the 28th day of September, 1896, pursuant to their said contract, and through the said company, they paid, or caused to be paid, to the defendant bank, the said two sums of £5,000 and £15,000, which, as we have already seen, were, in part at least, to be devoted to the payment of these plaintiffs, whatever balance there might remain of the purchase price of the Diamond Hill mines. It was under these circumstances that the defendant bank paid to plaintiff McDonald $15,000, leaving $15,000 still due, and the plaintiff Cooney $7,000, leaving $10,000 due him. It had the money then in its vaults to pay both of the plaintiffs in full. It knew of the agreement between Miller and Nimmo and Mitchell, and it stood by and permitted the plaintiffs to take the worthless note of Miller for the sums it had contracted to pay to him, and had not done so.

Appellant, in its brief, does not pretend that it was not competent for the bank thus to act as a trustee, and we might, perhaps, pass the matter without comment, but we think that there can be no doubt of its competency to act in this character. (*Isham* v. *Post,* 141 N. Y. 100, 35 N. E. 1084, 23 L. R. A. 90, 38 Am. St. Rep. 787.) Numerous cases might be cited showing that, where banks have undertaken to discharge a duty similar to that imposed on the defendant in this case, they have been held not liable, where they have discharged such duty without negligence on their part; and liable in every case where there was such negligence or bad faith. Another class of cases upon which there are numerous decisions are where specific deposits have been made for specific purposes, and there it is uniformly held that the bank must discharge its duty with reference to such deposits according to the instructions given it so to do, and, if it does not do so, it is liable. A specific deposit is one made for a specific purpose, and where, as in the case at bar, money is deposited to be paid to an individual, the bank must obey the instructions if it receives the deposit; otherwise, it will be liable to the party injured for its misapplication of the funds. (*Judy* v. *Bank,* 81 Mo. 404; *Bank* v. *O'Hare,* 119 Ill. 646, 10 N. E. 360; *Bundy* v. *Town of Monticello,* 84 Ind. 119; *Walker* v. *Bank* (C. C.) 25 Fed. 247; *Jaudon* v. *Bank,* 8 Blatchf. 430, Fed. Cas. No. 7,230; *Merchants' Nat. Bank of Fort Worth* v. *Phillip & Wiggs Mach. Co.,* 15 Tex. Civ. App. 159, 39 S. W. 217.) In the case at bar it must be held, under the terms of the seventh subdivision of the agreement quoted above, that the defendant bank undertook the duty of ascertaining the amount due from Miller to McDonald and Cooney on account of the purchase price of the mine, and that it undertook to pay out of the funds deposited for that purpose the sums so found due them. So far as the amounts, respectively, due to the plaintiffs were concerned, it had actual knowledge, as it held the deeds for their respective interests in escrow. It further undertook as a part of its agreement not to pay any money to Miller until it had first satisfied out of this specific

fund the amounts due these plaintiffs. Under these conditions it cannot be said that the money was not deposited for the benefit of McDonald and Cooney, or that the bank, by accepting the deposit, was not bound to apply the money in accordance with the terms of the contract. It had an active duty to perform, and it cannot free itself from this duty without showing such performance. The burden of proof was upon it to show that it had paid the plaintiffs in full, as was provided by the terms of the agreement under which it held the money; or that, if it had paid them a less sum, that the sum was paid to and received by plaintiffs, they having a full knowledge of all of the surrounding facts and circumstances, and expressly consenting thereto. (*Hall* v. *Marston*, 17 Mass. 574.) We think we are not mistaken in saying that, under the circumstances disclosed by the testimony in this case, the bank became a trustee for the benefit of these plaintiffs, and that it must be charged with liability as such. (2 Abb. Law Dict. tit. "Trusts;" 27 Am. & Eng. Enc. Law, p. 3; *Mannix* v. *Purcell*, 46 Ohio St. 102, 19 N. E. 572, 15 Am. St. Rep. 562; Civil Code, Secs. 2951, 2953, 3001.)

The knowledge and acquiescence of the beneficiary at the time of its creation has never been held to be necessary to the creation of a trust. It is sufficient if he assents when he learns of it, and where it is for his benefit his assent will be presumed. It is contended that there was nothing owing from Nimmo and Mitchell to the plaintiffs, and therefore that there was no consideration for the trust. To this contention two answers are pertinent: First, the relation of plaintiffs to the title to the property in question was of itself a sufficient consideration to uphold the trust; second, it needs no consideration to support it, as between these beneficiaries and the trustee. A trust which has been executed so far as the settlor is concerned cannot be defeated by the trustee for want of consideration. The trustee cannot take the money under the trust agreement, use it for his own benefit, and then dispute with the *cestui que* trust the validity of the agreement by which alone he obtained possession

of the fund.   (*Benjamin* v. *Gill,* 45 Ga. 110; *Smith* v. *Sutton,*
74 Ga. 528; *McLeran* v. *Melvin,* 56 N. C. 195; *Irby* v. *Kitchell,*
42 Ala. 438.)

The proposition that, where money is paid by one party to
another for the benefit of a third person, such third person may
enforce the payment thereof in law, has given rise to many
conflicting decisions; but the proposition is set at rest in the
state of Montana by Section 2103 of the Civil Code, which
declares that "a contract made expressly for the benefit of a
third person may be enforced by him at any time before the
parties thereto rescind it." The conflict in the authorities has
mainly arisen upon the question as to whether such contract
could be enforced at law, or whether the beneficiary must resort
to an equitable action.   It has been repeatedly held that, owing
to want of privity between the trustor and the beneficiary, it
could not be enforced at law; but it has always been the rule
in equity, when money has come into the hands of a promisor
under his agreement to devote it to a certain purpose, that
equity would compel him to devote it to that purpose at the suit
of the beneficiary.   All question with reference to this matter
is, we think, set at rest by the section just quoted; and under
the reformed method of procedure uniting legal and equitable
remedies the duty to pay over the money can be enforced in
an ordinary action for money had and received, as in the case
at bar.   (*McLaren* v. *Hutchinson,* 22 Cal. 188, 83 Am. Dec.
59; *Tyler* v. *Mayre* (Cal.), 27 Pac. 160; *Walden* v. *Karr,* 88
Ill. 49; *Williams* v. *Haskin's Estate,* 66 Vt. 378, 22 Am. St.
117, 29 Atl. 371; *Hirsh* v. *Auer,* 146 N. Y. 13, 40 N. E. 397;
*Lawrence* v. *Fox,* 20 N. Y. 268; *Hutchings* v. *Miner,* 46 N. Y.
456, 7 Am. Rep. 369; *Mellen* v. *Whipple,* 1 Gray, 317; *Fol-
lansbee* v. *Johnson,* 28 Minn. 311, 9 N. W. 882; *Stevens* v.
*Flannagan,* 131 Ind. 122, 30 N. E. 898; *Morgan* v. *Mining
Co.,* 37 Cal. 534; *Second Nat. Bank of St. Louis* v. *Grand
Lodge F. & A. Masons,* 98 U. S. 123, 25 L. Ed. 75.)

Can there be any doubt that in the case at bar funds came
to the defendant bank which in equity belonged to these plain-

tiffs? Can there be any doubt that, had these plaintiffs been informed that there were funds in the hands of the bank set apart for the payment of their demand, they would not have consented, and received only a part of the same, and the worthless notes of John S. Miller for the balance due them? Can there be any doubt, under the authorities, that the bank, by receiving the funds under the contract, undertook to pay the plaintiffs in full? In *Keller* v. *Ashford,* 133 U. S. 610, 10 Sup. Ct. 494, 33 L. Ed. 667, it is held that a mortgagee can maintain a suit in equity in the federal court against a grantee of mortgaged premises, who has assumed the payment of the mortgage, and in the opinion of Mr. Justice Gray is to be found a very full discussion of the reasons why suit in equity can be maintained upon promise made for his benefit by a third person, when such person could not maintain an action at law upon the same promise. A very complete note upon the subject of promises for the benefit of third persons, and the right to maintain actions thereon, is to be found in *Sanders* v. *McMillian,* 39 Am. St. Rep. 31 (s. c. 11 South. 750), in which the annotator says that the prevailing doctrine in this country is that the third person for whose benefit the promise is made may sue on it in his own name, whether made with or without his knowledge.

From the foregoing authorities it would seem to be plain that the bank, by the acceptance of the money under the terms of the agreement, assumed the relation of trustee to these plaintiffs, to pay over to them the full amount of money due them from John S. Miller. This duty was absolute, and could not be discharged by the payment of a less sum of money by the bank, unless it had communicated the information which it had that a sum of money more than adequate for the purpose had been provided for the payment of these claims, and that this payment was the last to be made to Miller on account of the sale of the property. Neither was it sufficient for the bank to assume that plaintiffs had full knowledge of all the facts by reason of their relations with Miller. It was the duty of

the bank, as trustee, to ascertain definitely what knowledge they had; or, in other words, to inform them completely of the duty which it had assumed.

The relation which the bank sustained to the plaintiffs was unquestionably that of an express trust for their benefit. Messrs. Nimmo and Mitchell were the trustors, the bank the trustee, and the plaintiffs the beneficiaries; exactly fulfilling the provisions of Civil Code, Sec. 2953. It is then equally beyond doubt that the bank was held to the utmost good faith in dealing with this trust. Our statute declares that a trustee may not obtain any advantage over the beneficiary by concealment, and is bound in all dealings with the beneficiary to the highest good faith. (Civil Code, Sec. 2970.) When it accepted this trust it bound itself to conform strictly to the directions contained in the instrument by which the trust was created. (2 Pom. Eq. Jur. Sec. 1062.) It was therefore the duty of the bank, inasmuch as it was taking upon itself the discharge of the trust in a way and manner not in conformity with the provisions of the instrument creating the trust, to give full information to the plaintiffs of the condition of the trust. This could have only been done by exhibiting to the plaintiffs the contract creating the trust, or giving them full information otherwise with reference to its terms and provisions. A concealment of the trust, whether intentional or otherwise, was a form of actual fraud, and rendered the bank liable for such damages as the plaintiff sustained by reason of its failure so to disclose the contract. (*Id.* Secs. 902, 3901.) It is a fundamental principle that a trustee in dealing with a *cestui que* trust, or in the management of the trust estate, must always show *uberrima fides*. (*Bound* v. *Railroad Co.* (C. C.), 50 Fed. 854.) Concealment is a breach of the trust. (1 Story, Eq. Jur. 214.) A trustee will always render himself liable where there is a concealment of a material fact which it is his duty to disclose. (*Id.* 217.) A trustee cannot, by the suppression of a fact which ought to be known to his beneficiary, entitle himself to a benefit. (*Id.* 220.) Men are not to

be entrapped by the fraudulent contrivance or cunning of those who purposely misled them. (*Id.* 222; 27 Am. & Eng. Enc. Law, 191.) If a party innocently misrepresents or conceals a material fact by mistake, it is equally conclusive, for it operates as a surprise and imposition on the other party. (*Juzan* v. *Toulmin,* 44 Am. Dec. 453.) The burden of proving the perfect good faith of the transaction between a trustee and the beneficiary is always upon the trustee. (27 Am. & Eng. Enc. Law, 193; *Pairo* v. *Vickery,* 37 Md. 467.) Acceptance of the trust by the trustee is presumed from his dealings with the trust property. (2 Pom. Eq Jur. Secs. 1007-1060.) The fact that the bank had in its possession the deeds in escrow and the agreement under which the trust was created raises the conclusive presumption that it had knowledge of the contents of the agreement, and it could not set up ignorance of the contents of such agreement. (2 Whart. Ev. Sec. 1243.)

It is sufficient, so far as plaintiffs are concerned, to show that the transaction of September 28, 1896, about which they were testifying, was made in utter ignorance of their rights, and would not have been made had they been apprised of the true state of affairs. Not only this, but the plaintiffs were misled into accepting partial payments of their claims through misrepresentations made by Johnson, the cashier, or by Miller in his presence, and not contradicted by Johnson. There is no dispute between the parties that $96,800 was received, and that by the express provisions of article 7 of the agreement the bank was to pay so much of this money to the plaintiffs, McDonald and Cooney, as remained unpaid on account of the purchase price of their interests in the Diamond Hill Mines. The defendant did not discharge its duty under this agreement, and concealed from the plaintiffs the true condition of affairs, and misrepresented to them the actual facts in the case. The appellants say that, "if we surrendered any rights through misrepresentation, our remedy is by an action for damages for the deceit," but they do not undertake to say that, "if the bank, by reason of having plaintiffs' deeds in escrow, and by reason

of the fact that they received this money, promised to pay it to us for the amount due on said deeds, we may not have exactly this sort of action against it;" and the authorities which we have already cited show most conclusively that this was so. They say the orders and consents by plaintiffs were admissible in evidence for the defense. We might add to this that, if the "orders and consents" made by plaintiffs had been made with a full knowledge on their part of the actual conditions of the trust, and that the money was in the bank to pay them in full, such "orders and consents" would have been absolutely conclusive. As they did not have this knowledge, and were misled by misrepresentations made by their trustee, or in his presence, and not contradicted by him, they cut no figure, other than to show the circumstances under which the transactions took place. It is said that an indefinite agreement as to amounts will not support *assumpsit*. Granted. But there was nothing indefinite about the agreement in this case. The bank, our trustee, had in its possession the deeds, and full information as to what amounts were due thereon, upon the payment of which into the bank to the credit of the plaintiffs they were authorized to surrender the deeds. Where it is the duty of a party by contract or otherwise to remit or apply money in his hands, and he fails to do it, no demand is necessary before bringing suit against him for such money. (*Ferguson* v. *Dunn's Adm'r,* 28 Ind. 58; *Caterlin* v. *Somerville,* 22 Ind. 482; *Stacy* v. *Graham,* 14 N. Y. 492.)

We have already seen by the authorities which have been cited that this defendant, having received this money under a promise to dispose of it in a certain way, and not having done so, is estopped from denying that the plaintiffs were strangers to the contract, or that said contract was not based upon sufficient consideration, or that there was no privity between the plaintiffs and the trustor. They say it was not made for the benefit of plaintiffs, nor either of them. In view of the fact that they are expressly named in the agreement, and that the bank received £20,000 under an agreement that it would pay

to these persons the amounts due them, it is hard to see upon what ground appellant can contend that this agreement was not made for the benefit of the plaintiffs.  If the seventh subdivision of this agreement is not for the benefit of plaintiffs, in what manner would it have to be made, or what would have to be its form and substance, in order to be a contract made for their benefit?  ·

Since this brief has been in print, 71 Am. St. Rep. has been issued, and in it we find a very complete monographic note on contracts for the benefit of third persons, appended to the case of *Baxter* v. *Camp,* to which we desire to call the attention of the court, particularly to the discussion of the "American rule," found on page 182, and "Contracts to pay the debts of another," on page 199 (s. c. 41 Atl. 802).   We also desire to call the court's attention to *Merriman* v. *Moore,* 90 Pa. 78.

·   Upon the question of consideration necessary to support such contract, and the privity required, we also beg leave to call attention to the following authorities:  "A valuable consideration, in the sense of law, may consist either in some right, interest, profit or benefit accruing to one party, or some detriment, loss or responsibility given, suffered or undertaken by the other." (3 Am. & Eng. Enc. Law, 831; 2 Kent. Comm. 465; *Rector, etc. St. Mark's Church* v. *Teed,* 120 N. Y. 583, 24 N. E. 1014.) "A consideration, however slight, is sufficient, provided there is no fraud in the transaction."  (*Spangler* v. *Springer,* 22 Pa. 454; *Pierce* v. *Fuller,* 8 Mass. 223, 5 Am. Dec. 102.)   "The consideration is sufficient if it arises from any act of plaintiff from which the defendant or a stranger derives any benefit, however small."  (*Esling* v. *Zantzinger,* 13 Pa. 50; *Hind* v. *Holdship,* 2 Watts, 104, 26 Am. Dec. 107.)   "Where a contract creates a duty or relation in the nature of a trust, the action is maintainable, the consideration retained being regarded as held in the nature of a trust for the persons indicated by the contract."  (*Follansbee* v. *Johnson,* 28 Minn. 311, 9 N. W. 882.)   "A person with whom or in whose name a contract is made for the benefit of another is a trustee of an express trust,

within the meaning of the statute." (*Lake* v. *Albert,* 37 Minn. 453, 35 N. W. 177.) "The consideration must move to the defendant, either from the plaintiff or the promisee." (*Wyman* v. *Smith,* 2 Sandf. 331-337.) "The placing of money in the hands of the promisor under his promise to pay it over is a sufficient consideration." (*Perry* v. *Swasey,* 12 Cush. 36; *Wyman* v. *Smith,* 2 Sandf. 337; *Kolloch* v. *Parcher,* 52 Wis. 393, 9 N. W. 67; *Lucas* v. *Chamberlain,* 8 B. Mon. 276; *Guthrie* v. *Kerr,* 85 Pa. 303.) "And the payment of the money to the promisor creates a sufficient privity of contract to enable the third party to recover." (*Esling* v. *Zantzinger,* 13 Pa. 50; *Hall* v. *Marston,* 17 Mass. 575; *Perry* v. *Swasey,* 12 Cush. 36; *Frost* v. *Gage,* 1 Allen, 262; *Jones* v. *Higgins,* 80 Ky. 409; *Brewer* v. *Dyer,* 7 Cush. 337.) There is not a case cited in appellant's brief which is in any particular like the case at bar, and not one cited that tends in any way to hold that in a case like the one at bar the plaintiffs might not recover.

*Messrs. McConnell & McConnell,* for Respondents.

(1) The central point around which all the facts group themselves, and upon which the appellant must be held liable, if at all, is paragraph 7 in respondents' Exhibit A. Upon this paragraph we observe: (a) That it provides that said £20,000 are not to be paid to said John S. Miller. (b) Said money was to be forwarded to the American National Bank of Helena, Mont. (c) It was to be applied by the said bank in paying off and discharging such "attachments, liens, incumbrances, claims and demands as may then exist against said properties, and in paying off and discharging such moneys as may then be owing from the said John S. Miller to John B. Wilson, Thomas D. Cooney and Angus A. McDonald for the unpaid purchase price of said properties." (d) That "only the surplus," if any, after the payment of such claims, was to be paid to said John S. Miller. The rest of the paragraph is immaterial, so far as this controversy is concerned. We further observe that respondents, McDonald and Cooney, and Wilson had been co-owners with

Miller in these propertites, which had been sold to Nimmo and Mitchell; but before said sale said respondents and Wilson had sold their interests on a credit to Miller, or at least very little had been paid thereon, and there were large balances due to respondents and Wilson; that in these sales deeds were executed by McDonald and Cooney to Miller, and placed in escrow in the American National Bank, the appellant, to be delivered to Miller upon payment by him of the balance of the purchase money due them respectively. About this there is no controversy. This fact was unquestionably known to Nimmo and Mitchell when they entered into the contract Exhibit A; hence the provision in clause 7 for the payment to Wilson, Cooney and McDonald of the unpaid purshase price of the properties. The trustors were directly interested in respondents. It was necessary for them to have these deeds in order to perfect their title. They sent the money to appellant, with directions to pay the same directly to respondents in redeeming these deeds. It further appears, as we will show in the proof, that an attachment had been levied upon the properties by Fraser & Chalmers. It is manifest that Nimmo and Mitchell intended by the provisions of paragraph 7 to apply a sufficient amount of the money sent to appellant directly to the payment of these incumbrances, claims or demands against the property, and to the payment of the unpaid purchase money due to these respondents from Miller. It is further manifest that they did not intend that there should go into the hands of Miller any of this money except the surplus which might be left after discharging these claims against the property. The proper construction of this paragraph is that it was only such debts and liabilities of the old Diamond Hill Mining Company as constituted a lien upon the properties, and would thereby cloud the title, that were intended to be paid out of the money sent to appellant. It will be noted that the character of the claims outside of those belonging to Wilson and respondents, which were to be paid was "attachments, liens, incumbrances, claims and demands as may then exist against said properties." The general indebtedness of the

Diamond Hill Mining Company, which did not constitute any lien or other claim or demand against the properties, was not intended to be, and was not, embraced. Nimmo and Mitchell, as purchasers, had no concern about the outside indebtedness of the Diamond Hill Mining Company. The proof only shows one debt outside of these vendors' debts which came within the provisions of this paragraph, and that was the debt of Fraser & Chalmers. Nimmo and Mitchell were especially anxious that Wilson and respondents should be paid, because otherwise Miller could not get title to their interests. There was an abundance of money to pay off all the outside demands against the property, and to have paid Wilson and respondents in full. It was the duty of appellant, under the trust reposed in it by the remitter of the money, to have ascertained the amount of these incumbrances, and the amounts due to respondents and Wilson, and have paid the same to the several parties to whom said amounts were due. It was "only the surplus" which was to be paid to Miller.

(2) The appellant accepted this money through its cashier, Mr. Johnson, and assumed to execute the trust reposed in it under said paragraph 7. Upon receipt of the money by the appellant, it became vested with such title to the money as would enable it to discharge the duty created by the contract, and in the manner directed by the contract. A duty arose out of the contract when the money was accepted binding appellant to pay said money to the parties named in the contract. These parties immediately became beneficiaries in this fund. Not a dollar of it belonged to Miller, nor could it, without a violation of the contract under which it was received, be paid to him, except the surplus left after paying the creditors described. The gist of this whole controversy, then, is, did the conditions above set out create a trust in which Mitchell and Nimmo were trustors, the appellant was trustee, and the creditors named were beneficiaries? For whom did appellant hold this money after it received it? Nimmo and Mitchell had parted with it. It was in the possession of appellant. It was not appellant's money.

"Only the surplus" was Miller's money. The remainder was the money of these creditors. It could belong to no one else. The appellant owed no duty to Miller under the contract, except to pay him the surplus. It owed a duty to the creditors described to the extent of paying them the money necessary to satisfy their demands.

(3) It is hardy necessary to refer to the common-law authorities on the subject of what constitutes a trust, because the provisions of our Civil Code cover the whole subject. Section 2951 defines a voluntary trust to be "an obligation arising out of a personal confidence reposed in and voluntarily accepted by one for the benefit of another." Can any transaction be brought more perfectly within this definition than the case at bar? The elements of "personal confidence reposed" and "voluntarily accepted" for "the benefit of another" all enter into the case at bar. The respondents were the persons in part for whose benefit the confidence of the remitter was reposed in appellant. The statute further defines and gives technical names to the parties to the trust. (Section 2953.) Section 2954 clinches the matter when it provides: "Every person who voluntary [voluntarily] assumes a relation of personal confidence with another is deemed a trustee, within the meaning of this chapter, not only as to the person who reposes such confidence, but also as to all persons of whose affairs he thus acquires information which was given to such person in the like confidence, or over whose affairs he, by such confidence, obtains any control." Is it not clear that, by virtue of the confidence reposed in the bank by the trustors, the money which came into its hands became subject to its control? We think we have demonstrated, then, that the bank was a trustee, and held this money in trust for the creditors named in the instrument creating the trust. Now, how did it discharge this duty? There underlies a great deal of the argument of counsel for appellant this fatal error: He assumes that what McDonald and Cooney did was as obligatory upon them as if they had done it with the full knowledge of their rights under this contract. He seems to ignore the fact

that, when they accepted $15,000 and $7,000, respectively, of this money from appellant, and surrendered their deeds to Miller, thereby they waived any right which they had under this contract to any more of said money than they actually received. Can it be supposed that, if they had been made acquainted with the provisions of this contract, and the duty of the bank to pay the money to them, they would have waived such right? The money was in the hands of the bank for them. It was not Miller's money, but theirs. They took Miller's worthless notes, and let him have their money, and all because they were ignorant of the fact that it was their money. Mr. Johnson was silent when it was his solemn duty to speak. It was in the hands of the trustee for them, and the trustee, with this contract right under his eyes, paid to Miller the $25,000 with which it had been intrusted for respondents. Respondents were in entire ignorance of their rights, and yet it is gravely argued that, because respondents accepted part of their money, and took Miller's notes for the remainder, that they thereby are estopped to complain of the appellant.

(4) From the evidence it appears that the appellant, through its cashier, had full knowledge, at the time this money was paid, of the contents of said clause 7. It is also uncontroverted that at the time the money was received by Mr. Johnson as cashier of the bank, McDonald and Cooney had no knowledge whatever of the provisions made in their behalf. It is undisputed that Cooney, McDonald and Wilson had sold their interests in the Diamond Hill Mines to John S. Miller, and had received some small payments therefor, and that said Miller owed McDonald some $46,000 and Cooney some $21,500 balance of purchase money; that at the time of such sale deeds were executed by said McDonald and Cooney to said Miller, and notes for the unpaid purchase money were executed by Miller, and said deeds and notes were placed in the American National Bank,—the deeds in escrow, to be delivered when the notes were paid, and the notes were placed there for collection; that about the 28th of September, 1896,—perhaps a day or two before this,—an

arrangement was made in contemplation of the money that was expected, and which came on the 28th of September, by which McDonald agreed to take the round sum of $30,000 for the balance that was due him, $15,000 of which to be paid out of the money expected, and Miller's note taken for $15,000, due in 60 days, to be paid out of another payment, which he represented was coming in some 30 days; that Cooney agreed to take the round sum of $17,000 for what was due him, $7,000 of which was to be paid in cash out of the payment expected, and the note of Miller was executed for $10,000, to be paid out of another payment, expected in about 30 days, as represented by Miller. An order was executed by McDonald, which was also signed by Miller, addressed to A. C. Johnson, cashier, directing him to pay out of the money to be received $15,000, and directing him to pay the $15,000 note out of the next payment. A similar order was executed by Cooney. It is a controverted fact as to whether Johnson represented to McDonald and Cooney, or either of them, that such further payment of $100,000 would be made. McDonald and Cooney both testify that he did, but he denies it. Miller also denies making any such promise. The sequel shows that no such money was to be paid, and that whatever representations were made to that effect were false. That Miller was guilty of willful falsehood when he testified that he made no such representation is fully shown by the following clause in the order which he signed to Johnson on the 28th of September, 1896, to-wit: "And also leaving with you his promissory note in my favor in the sum of $15,000, payable on or before 60 days after date, with the understanding that you shall retain that sum out of the next payment from the sum paid in on the sale of said mines, and place to my credit when so received." Miller's name is signed to this order, and it unquestionably refers to a future payment which he had represented to McDonald would be made through the bank, and out of which said note was to be paid. Johnson received this order, and he unquestionably knew that McDonald was expecting other money. Unquestionably the contract Exhibit A gave all the terms of the

sale, and in it could have been found the provision as to cash payments. If it contained no provision for another $100,000, then Miller invented this for the very purpose of misleading McDonald and Cooney, and getting them to take his notes for a part of their money. We do not say that Johnson made any representations on this subject. If he did, it was probably done upon the representations made by Miller. It is immaterial whether he did or not. It is enough that he had in his possession the contract which provided for the payment in full of respondents; that he had his attention called to the contract, and looked over it just before this transaction was closed, and made no disclosures to either of them of their rights thereunder. Respondents were placed between the devil and the deep sea,—the false representations of Miller by which they were deceived into taking his notes, and the profound silence of Mr. Johnson when it was his duty to speak. Mr. Johnson, by this course, made it possible for Miller to consummate his fraud upon respondents. He was guilty of a legal wrong in the violation of his plain duty to respondents under the contract. It is undisputed that the money would not have been paid until the titles of respondents were vested in Miller. Deeds of conveyance of McDonald, Cooney and Wilson had been executed at the time they sold their interests to Miller, and had been placed in escrow in the bank of appellant, and they were the deeds which Nimmo and Mitchell or their associates or successors had to have in order to get a title to the property which they had purchased, and for the getting of which they had made the provisions in clause 7 of the contract. Johnson must have known the exact sums coming to respondents before this money was paid out, as the same were fully disclosed in the orders given him for the delivery of the deeds.

As we have seen, the only liens, or incumbrances, or demands against the property which it was necessary for him to remove in order to be able to make a good title was the money due the vendors, and about $2,200, for which an attachment had been levied. $50,000 would have paid off respondents and Fraser

& Chalmers, and just what sum would have paid off Wilson is not disclosed, but the fact that he had a cash payment of $9,000 shows that the balance due him could not have been much more than the balance due Cooney. Nor could it make any difference as to whether the amount which the old Diamond Hill Mining Company owed appellant, which amounts to some $16,822 according to Miller, and some $13,000 according to Mr. Johnson, and upon which respondents were liable, would have been in the way of delivering said deeds. This indebtedness was no lien or demand against the property. Its payment was not provided for by the contract, but this could have been paid also, and respondents paid in full. The payment of this latter debt, however, was a matter entirely between respondents, Miller and the old Diamond Hill Company. It is claimed that McDonald insisted that this debt should be paid. Granted that this is true, it makes no difference, so far as the appellant's liability is concerned. It was no part of its duty in handling the money intrusted to it under the contract to pay these debts. We will not allow ourselves to believe that the fact that the appellant was interested in collecting this money due it had anything to do with its silence in relation to the provisions of paragraph 7 at the time this money was disposed of. But it is obvious that the appellant was interested in getting this money. The appellant, instead of paying to Miller "only the surplus," placed the whole sum of $96,800 to his credit, and paid it out upon his checks. This court cannot say that this money was all paid out under the provisions of said paragraph 7. And, even if it was so paid out, by what authority were these other debts, which constituted no incumbranace upon the property, paid in full, and respondents' debts, the most important of any, as they were for the very property itself, should be only paid in part? It can make no difference whether Nimmo and Mitchell paid said money to the bank, so it was paid to it for respondents under their contract. The bank received it under their contract, and they became trustors to it. It does not concern the bank from what source the money came. What one does through another he does himself.

(5) Appellant objected to the introduction of Exhibit A upon the ground that it was incompetent, irrelevant and immaterial, in this: Plaintiffs McDonald and Cooney are both strangers to the said paper, and are not entitled to any rights or benefits thereunder; there is no privity between plaintiffs; that said contract was not for the benefit of plaintiffs, and that it had been fully performed by the parties. In an action for money had and received it is not necessary that plaintiff should have anything to do with the paper or other instrument by which the defendant received the money for the use and benefit of the plaintiff. An action for money had and received is at common law a technical designation or a form of declaration in *assumpsit,* wherein the plaintiff declares that the defendant had and received certain money, etc. "The action will lie to recover money to which the plaintiff is entitled, and which in justice and equity, when no rule of policy or strict law prevents, the defendant ought to refund to the plaintiff. No privity of contract between the parties is necessary to sustain the action, except that which results from the possession by the defendant of the money which in equity belongs to the plaintiff." (Maxw. Code Pl. 247; 1 Estee, Pl. Prac. Sec. 838.) Mr. Estee says: "The general rule is that an action for money received lies whenever money has been received by the defendant which *ex aequo et bono* belongs to the plaintiff, or which in equity and conscience he has no right to retain, whether there be any privity between the parties or not." We hardly think that it can be seriously contended that said clause 7 in Exhibit A was not expressly or otherwise made for the benefit of the respondents. Mitchell and Nimmo had contracted to purchase the properties of the Diamond Hill Mining Company from Miller. In order to perfect the title in Miller, it was necessary to have the deeds of plaintiffs, held in escrow in the American National Bank, delivered to him, or to some one for him. In order to do this, it was necessary to pay the respondents the balance of the money due to them from Miller for the purchase of their interests in the properties of said company. Now, to do this, clause

7 was drawn, in which there is an express provision to pay the respondents their money. This certainly was a contract made for their express benefit. The objection that the contract had been fully performed by the parties is not true in point of fact. It had not been fully performed. A full performance would require appellant to pay the plaintiffs all of their purchase money. The fact that plaintiffs had ordered the deeds delivered, and accepted payment in part in the notes of Miller, when done in ignorance of their rights under said Exhibit A, cannot constitute a full performance of the contract.

It is not true, as we have seen, that "the evidence uncontradicted shows that all the money referred to in the case, to-wit, $96,800, was paid out by the defendant bank as it was directed to do by the remitter thereof." The remitter, in clause 7, directed appellant to pay plaintiffs their money in full. Instead of this, it paid them only a part. The remitter further directed appellant to pay off other creditors who had demands against the property. There was only one other such demand, as we have seen. This was paid in full. This was the only act which appellant did which was in full accordance with respondents. They must deal with them, and bring them within direction of the remitter. The appellant paid all of the balance of the money to Miller, including the balance which was due plaintiffs, and which was not paid. The direction of the remitter was to pay "only the surplus" to Miller after satisfying plaintiffs' demands in full. Instead of doing this, appellant permitted plaintiffs to accept the worthless notes of Miller for an aggregate sum of $25,000, and gave the money to Miller in direct violation of the instructions of the remitter, which required it to pay this money to respondents.

Counsel for appellant argues that: "The company had no concern for Miller's debts or his creditors. It owed no duty or obligation to plaintiffs and sought only its own protection. To Miller it was a matter of indifference whether the money paid certain claims or went to him. Only Miller, the company or Nimmo and Mitchell could complain of any breach of con-

tract by the bank." This argument does not state the whole case. The deeds to a part of the mines purchased were in escrow in the bank. Respondents were the makers of those deeds. Under the escrow agreement they could not be delivered until the purchase money due from Miller to respondents was paid. Nimmo and Mitchell, or their successors, were brought face to face with this proposition. They were not willing to pay the money to Miller, and trust him to use it to obtain these deeds; but they chose to deal directly with the respondents. Hence they sent the money to appellant, and reposed in it that confidence which they withheld from Miller. These purchasers were interested directly, and concerned with respondents. They must deal with them, and bring them within the provisions of this contract, in order to get the deeds necessary to vest a complete title in Miller, upon whose deed they had to depend for a title to the mines they had purchased. This course of dealing brought into the hands of appellant money devoted specifically to the benefit of respondents. No clearer case of money having been received for the use and benefit of another can be presented than the facts of this case make. Appellant is more than the agent of Nimmo and Mitchell, or their successors, charged with the duty of seeing that a good title is obtained. Appellant is intrusted by Nimmo and Mitchell with a sum of money, and charged with the duty of paying it to the respondents. The acceptance of this money was an agreement on the part of appellant to perform a double duty,—one to the remitter, and the other to respondents. It stood as a middleman burdened with a twofold duty. It is the trustor who reposes the confidence. It is the beneficiary whose interests are affected thereby. This double duty makes the appellant more than a simple agent. The relation of trustor and trustee between appellant and the remitter and the relation of trustee and beneficiary between it and respondents sprang into existence immediately upon the receipt of the money under the contract by appellant. The motive which induced the remitters to make this contract might have been to promote their

own interests. It was made for the benefit of respondents all the same. The question of the motive cuts no figure. Nothing can be plainer than that the contract was made for the benefit of the plaintiffs, while it at the same time subserved the interests of these purchasers.

It is claimed that it was essential to the bringing of this action that a demand should have been made by respondents of the appellant for the money claimed. There is no assignment of error upon this point in the record. It should, therefore not be noticed in this appeal. This is specified as a ground why plaintiffs should not recover in the argument of counsel under the heading of "the court erred in overruling and denying defendant's motion for a new trial." While the court found as a fact that no demand was made, it also found as a matter of law that no demand other than the bringing of the suit was necessary in order to maintain this action. This is not specified as error in the assignment of errors of law occurring on the trial. Indeed, the attention of the court below upon the motion for a new trial does not seem to have been called to this matter. But, aside from this, we insist, under the authorities, that no demand was necessary. (*Cox* v. *Delmas,* 99 Cal. 120, 33 Pac. 836; *Parrott* v. *Byers,* 40 Cal. 622.) The above decisions were rendered in 1893. No reference is made to the California statute whatever, notwithstanding that state had long had a statute of which our Section 2451 of the Civil Code is an exact copy. (See, also, 1 Estee, Pl. Prac. Sec. 836; *Stacy* v. *Graham,* 14 N. Y. 492; *Howard* v. *France,* 43 N. Y. 593.) We do not think that Section 2451 of the Civil Code has any reference to a trustee of an express trust, such as appellant was in this case.

MR. JUSTICE PIGOTT delivered the opinion of the Court.

By consent of the parties these causes were consolidated and tried together in the court below. The actions are for moneys received on September 28, 1896, by the defendant bank from

one Nimmo and one Mitchell, of Glasgow, Scotland, to and for the use of the plaintiffs. The plaintiff McDonald alleges in his complaint that the defendant so received for his use $19,230, and the plaintiff Cooney alleges in his complaint that the defendant so received $10,000 for his use. On these averments issues were joined and the causes tried by the court sitting without a jury. McDonald recovered a judgment for $17,942.15, and Cooney recovered a judgment for $11,543.25. From each judgment and from the several orders denying new trials the defendant has appealed.

Distinguished counsel have with a wealth of learning and with great ability argued and discussed at length many questions which we find not to be necessarily involved in the determination of these appeals. Abstracts of their briefs will be preserved in the report of this case. Some of the differences between counsel arise, we think, from a failure to give full significance to the facts. The transactions disclosed by the evidence created relations and rights that may be easily ascertained by the application of a few elementary principles of law.

In respect of the facts there was but little controversy. Between the testimony given by one Johnson, the cashier of the defendant bank, and one Miller, and that given by the plaintiffs, some conflict existed; but whatever the evidence in behalf of the prevailing parties tended to prove must, for the purpose of these appeals, be considered as established. So viewing the evidence, the material facts, concisely stated, are these: The plaintiffs, one John S. Miller, and one Wilson, owned in common certain mining claims called the "Diamond Hill Gold Mines." McDonald agreed to sell, and sold, his interest to Miller for $50,-000, and Cooney agreed to sell, and sold, his interest to Miller for $25,000. McDonald's deeds of conveyance were placed in the defendant bank in escrow to be delivered to Miller upon the payment of the full purchase price. The deeds of conveyance made by Cooney were delivered directly to Miller, the grantee, who placed them with the defendant bank; and Cooney also left with the defendant bank for collection the notes of

Miller for the unpaid purchase price of Cooney's interest in the mines.   On the 7th day of August, 1896, Miller entered into a contract with Nimmo and Mitchell, who resided in Scotland, by which he agreed to sell either to them or to a corporation or joint stock company to be organized by them, and they for themselves and such corporation or joint stock company agreed to purchase from him, the Diamond Hill gold mines. The sixth and seventh paragraphs of the contract are as follows: "Sixth.   It is further understood and agreed that a loan of fifteen thousand pounds at the same rate of interest as that of the debenture stock is to be made to said John S. Miller by said company when it is organized.   As security for this loan, said Miller is to hand over to and pledge with said company, to be registered as it may direct, twenty thousand pounds of preference shares and twenty thousand pounds of ordinary shares of said company; and said Nicholas F. Cleary is to hand over to and pledge with said company ten thousand pounds of such preference shares.   *   *   *   Seventh.   It is further understood and agreed that the second cash payment of five thousand pounds and the loan of fifteen thousand pounds are not to be paid directly to said John S. Miller, but are to be forwarded at the time stipulated herein therefor to the said American National Bank of Helena, Montana, to be applied by the said bank in paying off and discharging such attachments, liens, encumbrances, claims, and demands as may then exist against said properties, and in paying off and discharging such moneys as may then be owing from said John S. Miller to John B. Wilson, Thomas D. Cooney, and Angus A. McDonald for the unpaid purchase price of said properties, and only the surplus, if any, after the payment of such claims, is to be paid to said John S. Miller, and clauses marked 'third' and 'sixth' of this agreement are hereby modified so as to conform to this clause." The plaintiffs knew nothing of the terms or conditions of this contract.   Pursuant to the covenant of the contract in that behalf, a corporation or joint stock company, by name the Diamond Hill Gold Mines, Limited, was organized, and to this company

Miller was to transfer the properety upon payment of the specified purchase price. In accordance with the provisions of the seventh paragraph of the contract the company transmitted by draft to the bank twenty thousand pounds, the equivalent of $96,800 in currency of the United States. On September 28, 1896, the defendant bank received and accepted the remittance from the company. Accompanying the draft was a copy of the contract and the attention of the cashier was called to the seventh paragraph which contained the authority and directions with respect to the application and disposition of the funds. In receiving and accepting the draft and in all matters connected with the proceeds thereof the defendant acted through its cashier, one A. C. Johnson. Before the bank received the draft and between the 24th and 28th days of September, 1896, an agreement was made between Miller and the plaintiffs whereby the latter consented that the bank should pay to McDonald $15,000 and to Cooney $7,000 instead of $30,000 and $17,000, the remainder of the purchase prices due to them respectively, and that they would, in lieu of cash, accept Miller's notes for $15,000 and $10,000 for the remainder, the notes to be paid out of the next installment received from the Scottish purchasers. Miller had assured the plaintiffs that he was to receive a further payment of $100,000 within thirty days after September 28, and this statement of Miller was corroborated by the defendant's cashier. The plaintiffs knew the amount of the draft received by the bank. The bank was orally advised by Miller, McDonald and Cooney of the agreement that out of the $96,800 then held by the bank, McDonald and Cooney should receive $15,000 and $7,000, respectively, and no more. Pursuant to the agreement between them and Miller the plaintiffs on the 28th day of September, 1896, delivered to the bank written orders stating how much of the funds were to be paid to them. The order of McDonald instructed the bank to deliver to Miller the deeds in escrow upon his paying into the bank to McDonald's credit the sum of $15,000 and leaving with the bank his note in McDonald's favor for $15,000 payable

in sixty days after date, the bank to retain out of the next payment from the Scottish purchasers an amount sufficient to liquidate the note; the order from Cooney authorized the bank to surrender to Miller the notes then in the bank's custody upon Miller's depositing to Cooney's credit $7,000 and his note to Cooney for $10,000 due at thirty days. Upon Miller's cheques therefor the bank paid these sums to the plaintiffs, and disbursed in payments to other persons, including the bank itself, the remainder of the $96,800—all upon Miller's cheques, the money having been deposited to the credit of Miller. Neither McDonald nor Cooney was informed of the contents of the clause quoted, and not until December, 1897, about fifteen months after the transactions to which reference has just been made, did the plaintiffs learn that if they had not otherwise agreed with Miller they could have been paid in full out of the $96,800 remitted from Scotland, and that the written instructions touching the disposition of the funds directed that the plaintiffs be paid in full. No further remittance came from Scotland to the defendant bank and, the notes of September 28, 1896, not having been paid (except $250 on the note to Cooney) these actions were commenced.

The actions are for moneys received by the defendant bank from Nimmo and Mitchell to and for the use of the plaintiffs. Much argument has been advanced with respect to the liability of the bank for the supposed fraudulent misrepresentations of its cashier. It has been strenuously insisted that he was guilty of fraud and deceit in passively concealing from the plaintiffs the directions quoted in the seventh paragraph of the contract and at the same time representing that a further payment of $100,000 was to be made to Miller within thirty days, when he must have known from the contract that the draft for $96,800 was the final payment. If by fraud or deceit the plaintiffs were induced to waive or surrender any legal rights or sustained other injuries, they must seek remedies in appropriate actions. Unless the bank received money to and for their benefit they cannot prevail under the present pleadings.

The ultimate question is: Did the defendant receive from Nimmo and Mitchell, or the Diamond Hill Gold Mines, Limited, money to and for the use of the plaintiffs,—in other words, did the bank have in its custody or possession moneys or funds received from Nimmo and Mitchell or the company, to which, as against the bank, the plaintiffs were entitled? Counsel for the plaintiffs invoke the provisions of Title VIII of Part IV of Division III of the Civil Code, entitled "Trusts," insisting that the bank received and held the money sued for as a trust fund belonging to the plaintiffs, that Nimmo and Mitchell were the trustors of a voluntary trust, the defendant the trustee, and the plaintiffs the beneficiaries, and that the duty devolved upon the trustee to disclose to the beneficiaries the contents of the seventh paragraph of the contract between Nimmo and Mitchell and Miller. They call to their aid also Section 2103 of the Civil Code, which provides that "a contract, made expressly for the benefit of a third person, may be enforced by him at any time before the parties thereto rescind it;" and this, they argue, conferred upon the plaintiffs the right to maintain the actions, even if a technical trust did not exist.

Miller purchased from the plaintiffs their interests in the Diamond Hill gold mines and he was indebted to them for the unpaid purchase price. Neither Nimmo and Mitchell nor the company bought or agreed to buy from the plaintiffs, and hence neither of the former was indebted to either of the plaintiffs or owed to them, or to either of them, any legal duty whatsoever with respect to the money to be paid to Miller as the purchase price. But as Nimmo and Mitchell knew that the plaintiffs held or had held interests in the properties, they determined not to make full payment directly to their vendor, Miller, but to send, or cause the Diamond Hill Gold Mines, Limited, to transmit, the purchase price or a sufficient part of it through such channels as would insure their own and their company's protection against adverse claims for the unpaid purchase price or for liens or incumbrances of any kind. Such method of payment was chosen from motives of self-interest

and not from any design to benefit the plaintiffs, nor in fulfill-
ment of any duty or obligation to them.  For these reasons,
from these motives, and for the accomplishment of these ends,
the Diamond Hill Gold Mines, Limited, sent to the defendant
bank the remittance of $96,800, and directed it not to pay out
any part of the funds to Miller except such as might remain
after making the specific payment "of such moneys as may
then be owing from said John S. Miller to John B. Wilson,
Thomas D. Cooney and Angus A. McDonald for the unpaid
purchase price of said properties."  The defendant bank ac-
cepted this remittance or deposit subject to the terms and con-
ditions thus lawfully imposed.  It had no interest in the funds
and no authority concerning them except such as were con-
ferred by the directions of those who had conditionally deposited
them subject to specific instructions.

What, then, was the legal relation of the several parties to
the funds while thus in the custody of the bank?  As we have
said, the Scottish purchasers did not buy from the plaintiffs;
they were under no obligation to them; they owed to them no
duty and they owed to them no money.  They did not agree to
pay Miller's debts to the plaintiffs, but for their own protection
made Miller agree that they or their corporate successor might
send a part of the money due from them to Miller to the de-
fendant bank with authority to pay the plaintiffs therefrom.
When they authorized and directed the bank to pay the plain-
tiffs it was not because they had promised the plaintiffs to do
so, but merely because they had required Miller to consent to
that method of protecting themselves and pursuant to a stipu-
lation for their benefit and protection in the contract with him.
At the time the remittance was made, it was not, nor were the
conditions and restrictions as to payment, purely voluntary;
the payment of the funds into the bank was made at the time,
by the method, and upon the terms theretofore agreed upon
between the vendor, Miller, and the Scottish purchasers, Nin-
mo and Mitchell; hence the deposit and its accompanying di-
rections as to disbusement were in discharge of obligations and

in performance of duties owing by the Scottish purchasers to their vendor.    The contract pursuant to which this special deposit was made, having been entered into between Nimmo and Mitchell on the one part, and Miller on the other, manifestly was completely under their control, and could have been modified or annulled by their joint action at any time before other persons in some way parted with value or altered their rights in reliance upon its provisions.    During the time the contract thus made remained revocable and under the control of the parties to it, obviously the plaintiffs acquired no rights under it, and even after the deposit had been made with the bank in fulfillment of the agreement we think there can be no doubt of the right of the parties to it by joint action to cancel the agreement, recall the deposit, and successfully demand of the bank the return to them of the funds.

While we have thus briefly considered the rights of the respective parties as to the contract between Nimmo and Mitchell and Miller and the funds to be paid into the bank pursuant to it, and have decided that neither the bank nor the plaintiffs had any vested rights concerning either, and that the parties to the contract had complete control of it and of the funds remitted under it, we cannot ignore the fact that the contract was not modified or annulled and the funds were not recalled. Under these circumstances and in the light of the relation of the respective parties and persons to the funds, what was the legal force and effect of the seventh paragraph, which was not modified or annulled and subject to the terms and conditions of which the special deposit was made?    When the funds were accepted by the bank, its cashier received a copy of the written contract, and this constituted the sole source of the bank's authority touching the disposition of the funds; the contract provided that the money should be forwarded to the bank and how it should be applied by the bank.    In so far as the contract related to the funds, its purpose was to give specific directions by the depositors as to the disbursements to be made by the bank out of the funds thus deposited.    The restrictions and direc-

tions could have been changed by the parties to the contract under the terms of which the deposit was made; but the restrictions and directions were not changed and therefore the bank had no authority to make any payments out of the funds other than those directed to be made by the seventh paragraph of the contract. It must be remembered that the funds belonged to the parties (or, to speak more accurately, to the Diamond Hill Gold Mines, Limited, as general owner, Miller having a special interest) to the written contract containing the limitations upon the bank's powers, and hence these limitations must be understood to be limitations of the bank's authority as between the bank and the depositing owners. The bank had powers concerning the funds because the depositors conferred it, and that power was limited because the depositors limited it; any violation of the limitations would have been a violation of the duty the bank owed to the owners of the funds. If the funds were not disposed of as directed by the owners and depositors, they may complain of such a violation of their directions and such a misapplication of their funds; but so long as the funds remained subject to the control or even to the recall of the depositing owners, it cannot correctly be said that the bank owed to other persons a duty concerning the funds. Its authority and justification for paying any part of the funds to the plaintiffs must be found in the directions of the depositing owners; if it failed to make any payments directed by them it has disobeyed their instructions and if they were injured thereby a liability to them may have arisen. If, on the other hand, the bank has made payments which were not authorized by the depositors, it might find difficulty in legally accounting for the funds intrusted to it by claiming credit for such unauthorized disbursements. The bank received on deposit from the Scottish purchasers a large sum of money with instructions to pay therefrom whatever amounts were owing from Miller to the plaintiffs for the unpaid purchase price of certain mining claims. To one of the plaintiffs the bank paid $15,000 and to the other $7,000. These payments were expressly authorized,

but they did not exhaust the bank's power; it was authorized and directed by the depositors to make further payments to the ·plaintiffs, but it failed to obey the direction.   The contention is that the bank not only had authority to make further payments to the plaintiffs, but that its duty was to exercise the authority and make such payments; that, by the acceptance of the deposit upon the terms expressed in the contract the bank impliedly promised the parties thereto that it would make to the plaintiffs all the payments authorized, and that such promise is enforceable by the plaintiffs as one made for their benefit.

For the purpose of testing the soundness of this contention we inquire when the supposed duty of the bank to the plaintiffs arose, when its supposed promise was implied, when the plaintiffs' supposed rights matured, and when the depositing owners of the funds lost all rights to, interest in, and control over the funds thus specially deposited?   If after the funds had been deposited pursuant to the terms of the contract and before any payment had been made by the bank, all of the parties to the contract had rescinded it, notified the bank of the rescision, and demanded the return of the funds, could the bank have successfully refused to comply with the demand   upon   the ground that while such revocation might have been effective at any time before the deposit was actually made, yet the moment the bank accepted the money it impliedly assumed obligations to the plaintiffs of which the depositors could not relieve it?   When A. furnishes funds to B. and directs him to pay them to C. to whom A. is not obliged to pay them and to whom he owes no legal duty in that regard, is such authority irrevocable or may it be recalled at any time before the power is exercised by making payment?   These questions answer themselves. The sole source of the bank's authority was the provision contained in the seventh paragraph of the contract, and by accepting the deposit the bank impliedly promised not to make any payments except such as the depositors authorized, and if the payments agreed to be made and therefore authorized and directed had been afterwards forbidden by the unanimous action

of those under whose authority the bank was holding the money, plainly the bank could not properly have continued to act under the revoked power previously conferred.

The plaintiffs are not asserting in a suit against Nimmo and Mitchell, or the Diamond Hill Gold Mines, Limited, the Scottish purchasers, that the latter promised Miller to pay his debts to the plaintiffs. The actions rest upon the theory that the bank made an implied promise to Nimmo and Mitchell to pay to the plaintiffs the amounts of Miller's debts to them, and it is contended that this promise is to be implied from the mere acceptance of the funds from the Scottish purchasers with directions to pay the plaintiffs therefrom, and that such promise was a contract made expressly for the benefit of the plaintiffs. It is further contended, as has already been observed, that the receipt of the deposit created a voluntary trust of which Nimmo and Mitchell (or the Diamond Hill Gold Mines, Limited) were trustors, the defendant bank trustee, and the plaintiffs beneficiaries. It is not suggested that Miller was trustor. Section 2951 of the Civil Code defines a voluntary trust as an obligation arising out of a personal confidence reposed in and voluntarily accepted by one for the benefit of another. Section 2953 of the same Code declares that "the person whose confidence creates the trust is called the trustor; the person in whom the confidence is reposed is called the trustee; and the person for whose benefit the trust is created is called the beneficiary." Section 2956 declares that "a voluntary trust is created, as to the trustor and beneficiary, by any words or acts of the trustor, indicating with reasonable certainty, * an intention on the part of the trustor to create a trust." Counsel have failed to cite any well-considered case involving the application of legal principles to facts similar to those here presented in which either contention has been approved by a court of last resort; nor do we think the principles of law or the doctrines of equity countenance either position. In so far as they are applicable to the facts of the case at bar, the fundamental principles in the light of which Section 2103, *supra,* should be interpreted

may be thus illustrated:   An executed contract does not require a consideration to support it.   For example, a gift consummated is an executed contract.   But a contract of gift the subject of which is not delivered is without consideration—a mere *nudum pactum*—and therefore not enforceable by the donee.   The provisions of section 2103 do not embrace gifts not perfected or other executory contracts lacking consideration.   It should seem to be manifest that the legislature did not intend to declare that an executory contract in which there is a promise to make a gift to or to confer a gratuity upon a third person may be enforced by him.   To come within the meaning and scope of the section, the (executory) contract made expressly for the benefit of a third person must be one whereby the promisor undertakes to pay or discharge some debt or duty which the promisee owes to the third person,—in other words, the third person must sustain such a relation to the contracting parties that a consideration may be deemed to have passed from him to the promisee which raises the implication of a promise from the promisor directly to himself.   There must be a consideration passing from the third person by virtue of which he may assert the existence of a promise in his favor.   We do not attempt to interpret the section further than the facts in this case seem to require.   The evidence does not indicate to any extent whatever that the contract between Nimmo and Mitchell and Miller was made expressly for the benefit of the plaintiffs, however much they might have been incidentally benefited by the performance of all of its terms.   There is nothing tending to show that either Nimmo and Mitchell (who contracted with Miller) or the Diamond Hill Gold Mines, Limited (which remitted the funds pursuant to the contract) owed any duty to the plaintiffs or intended to create a trust for their benefit.   On the contrary, the provision of the contract as to payments was entirely for the benefit and protection of the parties to it and their successors, created no rights in persons not parties to it, and was revocable at pleasure by those who had (at least so far as the plaintiffs are concerned) voluntarily entered into it.

We do not assent to the doctrine that such a special deposit subject to recall, or such revocable directions for the payment of money, creates implied contract obligations towards the persons to whom the payments were directed to be made.

We are of the opinion, therefore, that although the bank was authorized to pay to the plaintiffs more of the funds than it did pay to them, it was under no legal obligation to the plaintiffs to make such payments; that whatever obligations it impliedly assumed towards the funds were obligations to the depositors and not to the plaintiffs, and the limited obligations thus assumed were not obligations to pay the plaintiffs but, rather not to pay Miller until the unpaid purchase price due from him to them had first been liquidated;—and hence it was not liable to the plaintiffs to whom it might have made but did not make payments. Entertaining these views, we perceive no reason for considering the relative rights of trustees and beneficiaries which have been so fully and exhaustively discussed by counsel. Under the pleadings and proof we think it clear that so far as the plaintiffs are concerned the law relating to trusts is without pertinency.

The evidence did not tend to prove that the defendant bank received to or for the use of either plaintiff any money from Nimmo and Mitchell or the Diamond Hill Gold Mines, Limited. The allegations of the complaints were not sustained by the proofs, and hence the plaintiffs failed to make a case. Irrespective, therefore, of the effect of the orders given by the plaintiffs to the bank, the plaintiffs were not entitled to recover in actions for moneys received by the defendant from Nimmo and Mitchell to their use.

The orders and judgments appealed from are reversed and the causes are remanded with directions to grant new trials.

*Reversed and remanded.*

Rehearing denied July 31, 1901.